**In re AIRCRAFT ACCIDENT AT LITTLE ROCK, ARKANSAS, JUNE 1, 1999.**

No. 4:99–CV–1308.
MDL No. 1308.

United States District Court, E.D. Arkansas, Western Division.

Nov. 20, 2002.

Michael E. Hale, Glenn W. Jones, D. Keith Fortner, Barber, McCaskill, Jones & Hale, P.A., Philip E. Kaplan, Regina Haralson, Kaplan, Brewer & Maxey, P.A., Michael Norris Shannon, Scott J. Lancaster, J. Phillip Malcom, William H. Sutton, Friday, Eldredge & Clark, Byron L. Freeland, Marshall S. Ney, Mitchell, Williams, Selog, Gates & Woodyard, P.L.L.C., Little Rock, AR, Ted Boswell, James Ralph Jackson, Boswell, Tucker & Brewster, Bryant, AR, Sam Hilburn, Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd., North Little Rock, AR, Debbie Dudley Branson, Frank L. Branson, Frank L. Branson L. Branson, P.C., Dallas, TX, Peter A. Miller, Attorney at Law, Michael G. Smith, Dover Dixon Horne, PLLC, Little Rock, AR, Kathlynn G. Fadely, Barry F. Benson, Gary W. Allen, U.S. Department of Justice, Mark B. Baylen, Federal Aviation Administration Litigation Division, Washington, DC, John R. Howie, Ladd Sanger, Elizabeth Florence, Howie & Sweeney, L.L.P., John H. Martin, Jennifer P. Henry, George Lucas Ashley, Maureen A. Murry, Thompson & Knight, L.L.P., Dallas, TX, R. Bryant Marshall, Marshall & Owens, P.A., Jonesboro, AR, Norman R. Gordon, Norman R. Gordon & Associates, Shreveport, LA, C. Burt Newell, Bachelor & Newell, Hot Springs, AR, Mark F. Hampton, Hampton & Larkowski, David H. Williams, Attorney at Law, Little Rock, AR, Camille Nicodemus, Kasowitz, Benson, Torres, Friedman, L.L.P., New York City, Scott C. Trotter, G. Alan Perkins, Hill, Gilstrap, Perkins & Trotter, Little Rock, AR, Jimmy W. Evans, Steve Maxwell, Michael D. Schattman, Hill Gilstrap, Arlington, TX, Katherine A. Staton, Jackson Walker L.L.P., Dallas, TX, Robert A. Clifford, Kevin P. Durkin, Clifford Law Offices, P.C., Chicago, IL, Randal R. Craft, Jr., William C. Brown, III, Louise B. Cobbs, Alan D. Reitzfeld, Holland & Knight, LLP, New York City, James W. Orr, Bowers, Orr & Dougall, L.L.P., Columbia, SC, Gene A. Ludwig, Ludwig Law Firm, PLC, Little Rock, AR, Michael G. McQuillen, James F. Murphy, Peter V. Bustamante, Adler, Murphy & McQuillen, Chicago, IL, Robert Stockton, Carr & Carr, Tulsa, OK, Nelson P. Miller, Fajen & Miller, P.L.L.C., Grand Haven, MI, Gerald Sterns, Elizabeth Walker, Sterns & Walker, Oakland, CA, Michael L. Slack, John C. Allman, Donna Bowen, Slack & Davis, L.L.P., Austin, TX, David Cook, Kreindler & Kreindler, New York City, Kent Krause, Speiser, Krause, R. Brent Cooper, Cooper & Scully, Dallas, TX,

Charles L. Coleman, III, Mark L. Venardi, Holland & Knight LLP, San Francisco, CA, William M. Bache, Monroe & Associates, Tucson, AZ, John A. Greaves, Baum Hedlund, Aristei Guilford & Downey, Los Angeles, CA, Collin M. Fritz, Trecker & Fritz, Honolulu, HI, D. Douglas Cotton, American Airlines, Inc., Fort Worth, TX, Thomas J. Morris, III, Morris & Powell, Ponca City, OK, Matthew H.P. Warner, Graves Warner, PLC, Little Rock, AR, Robert R. Bodoin, Andrew Piel, Bodoin, Burnside & Burge, P.C., Fort Worth, TX, George A. Manfredi, Daniel A. Johnson, Daniel M. Sullivan, Sullivan, Johnson & Manfredi, LLP, Los Angeles, CA, David L. Sandweiss, Attorney at Law, Phoenix, AZ, David E. Rapoport, Paul D. Richter, Rapoport Law Offices, P.C., Chicago, IL, David A. Couch, Couch O'Quinn, PLLC, Rickey H. Hicks, Attorney at Law, Little Rock, AR, George Quesada, Sommerman, Moore, Mitchell & Quesada, L.L.P., Dallas, TX, for Air Crash at Little Rock, Arkansas, on June 1, 1999.

Jennifer P. Henry, Thompson & Knight, L.L.P., Dallas, TX, Eric Steinle, Felicia C. Curran, Brenda D. Posada, Sterns & Walker, Oakland, CA, for American Airlines, Inc.

Richard M. Pence, Jr., U.S. Attorney's Office, Little Rock, AR, Barry F. Benson, Terence M. Healy, Jill Dahlmann Rosa, U.S. Department of Justice, Washington, DC, for U.S.

### MEMORANDUM OPINION AND ORDER

EISELE, District Judge.

## I. Introduction

Before the Court is the Defendant American Airlines, Inc.'s Motion for Partial Summary Judgment Dismissing Plaintiffs' Claims for Punitive Damages in all Domestic Actions (Doc. No. 117), filed April 2, 2001. On June 29, 2001, the Plaintiffs responded (Doc. No. 125), and on September 4, 2001, the Defendant filed a reply thereto (Doc. No. 130). In ruling on the issues raised in the instant motion, the Court has considered the entire summary judgment record, and in particular the following:

(1) Plaintiffs' Memorandum of Law Regarding a Choice of Law Ruling Applying the Law of Arkansas to the Issue of Punitive Damages in all Domestic Cases Against American Airlines (Doc. No. 13), filed March 1, 2000;

(2) Memorandum of Law Submitted by American Airlines, Inc. in Response to Plaintiffs' Memorandum of Law Regarding the Choice of Law for Determining Liability for Punitive Damages in all Domestic Actions Against American Airlines (Doc. No. 23), filed April 3, 2000;

(3) Plaintiffs' Reply Regarding the Choice of Law Ruling Applying the Law of Arkansas to the Issue of Punitive Damages in all Domestic Cases Against American Airlines (Doc. No. 28), filed April 13, 2000;

(4) Sur–Reply Submitted by American Airlines, Inc. Regarding the Choice of Law for Determining Liability for Punitive Damages in all Domestic Actions Against American Airlines (Doc. No. 39), filed May 5, 2000;

(5) Supplemental Memorandum Submitted by American Airlines, Inc. Regarding the Choice of Law for Determining Liability for Punitive Damages in all Domestic Actions Against American Airlines (Doc. No. 106), filed December 4, 2000;

(6) Plaintiffs' Supplemental Memorandum of Law Regarding Choice of Law for Domestic Passenger Punitive Damages Claims Against American Airlines (Doc. No. 111), filed December 21, 2000;

(7) Memorandum of Law in Support of American Airlines, Inc.'s Motion for Partial Summary Judgment Dismissing Plaintiffs' Claims for Punitive Damages in all Domestic Actions (Doc. No. 118), filed April 2, 2001;

(8) Exhibits in Support of American Airlines, Inc.'s Motion for Partial Summary Judgment Dismissing Plaintiffs' Claims for Punitive Damages in all Domestic Actions (Doc. No. 119), filed April 2, 2001;

(9) Statement of Material Facts Submitted by American Airlines, Inc. in Support of its Motion for Partial Summary Judgment Dismissing Plaintiffs' Claims for Punitive Damages in all Domestic Actions (Doc. No. 120), filed April 2, 2001;

(10) Exhibits in Support of the Plaintiffs' Steering Committee's Response to Defendant's Motion for Summary Judgment, volumes I and II, (Doc. No. 126), filed June 29, 2001;

(11) Plaintiffs' Statement of Material Facts (Doc. No. 127), filed June 29, 2001;

(12) American Airlines, Inc.'s Objections to Plaintiffs' Statement of Material Facts (Doc. No. 131), filed September 4, 2001;

(13) Second Supplemental Memorandum Submitted by American Airlines, Inc. Regarding the Choice of Law for Determining Liability for Punitive Damages in all Domestic Actions Against American Airlines (Doc. No. 132), filed September 4, 2001;

(14) Plaintiffs' attorney Robert R. Bodoin's April 19, 2002, letter to the Court;

(15) Plaintiffs' attorney Frank L. Branson's April 25, 2002, letter to the Court;

(16) Defendant's attorney John H. Martin's April 25, 2002, letter to the Court; and

(17) Defendant's attorney John H. Martin's May 3, 2002, letter to the Court.

In addition the Court also reviewed the transcripts of four in-court hearings conducted by Judge Henry Woods on January 31, 2000, June 1, 2000, August 1, 2000, and December 11, 2000.[1]

After considering the summary judgment record and the applicable law the Court concludes that the Defendant American Airlines, Inc.'s Motion for Partial Summary Judgment Dismissing Plaintiffs' Claims for Punitive Damages in all Domestic Actions must be granted.

## II. Procedural Background

This MDL arises from a June 1, 1999, incident in which an American Airlines MD–82 jet aircraft, being operated as Flight 1420 from Dallas/Fort Worth International Airport to Little Rock National Airport, departed the runway and crashed into a non-frangible light stanchion and broke apart after touching down at Little Rock. The incident occurred at night and in stormy weather conditions. Flight 1420 carried 145 individuals: 139 passengers, two pilots and four flight attendants. Ten passengers and the chief pilot received fatal injuries, many of the other passengers were seriously injured, and the aircraft was destroyed.

On December 15, 1999, the Judicial Panel on Multidistrict Litigation consolidated the various federal lawsuits filed in regards to the crash into the instant MDL.

---

1. As noted *infra,* on March 28, 2002, the Judicial Panel on Multidistrict Litigation reassigned this matter from Judge Woods's docket to the undersigned's docket.

The MDL was assigned to Judge Henry Woods's docket. In their various suits the Plaintiffs generally sought compensatory damages and requested that punitive damages be assessed against the Defendant. Early in the proceedings Judge Woods determined that the compensatory damages claims should be bifurcated from the punitive damages claims, and resolved first.

The Plaintiffs were also separated into two groups: domestic and international passengers. The Court concluded that under the terms of the Warsaw Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 876 U.N.T.S. 11 (1934), *reprinted at* 49 U.S.C. § 40105 (note) ("Warsaw Convention"), the international passengers were as a matter of law prohibited from recovering punitive damages. Thus, the Court concluded, only the domestic passengers would be permitted to pursue their punitive damages claims. *See, e.g., In re Air Crash at Little Rock, Arkansas, on June 1, 1999,* 109 F.Supp.2d 1022, 1024 (E.D.Ark.2000) ("The pertinent part of the Warsaw Convention, as it applies to the instant litigation, provides that punitive damages are barred in suits by international passengers. This is the holding of three United States Court of Appeals. *See, Floyd v. Eastern Airlines,* 872 F.2d 1462 (11th Cir.1989); *Korean Air Lines Disaster of September 1, 1983,* 932 F.2d 1475 (D.C.Cir.1991); *In re Air Disaster Lockerbie, Scotland on December 21, 1988,* 928 F.2d 1267 (2d Cir.1991). At the initial conference with the attorneys in this litigation, I advised them that punitive damages would not be permitted in the cases involving international passengers. In other words, I told the parties that I would follow the decisions of the three Courts of Appeals, even though the Court of Appeals for the Eighth Circuit has not yet considered the issue of the availability of punitive damages in cases involving in-

ternational passengers."). As regards the domestic passengers the Court concluded that "[p]unitive damages can be obtained if permitted by applicable state law and justified by the evidence." *Id.*

The compensatory damages claims proceeded first. The Defendant admitted liability for the crash and individual trials were scheduled to assess compensatory damages. Thereafter the Defendant reached settlement agreements with a majority of the domestic Plaintiffs. The settling domestic Plaintiffs relinquished not only their compensatory damages claims, but their punitive damages claims as well.

Three compensatory damages trials involving domestic Plaintiffs were ultimately tried to a jury. The three matters were all originally filed in the Eastern District of Arkansas:

(1) *Nancy Chu v. American Airlines, Inc.,* Case No. 4:99–CV–495 in the Eastern District of Arkansas. This case was tried in April 2001 and the jury assessed compensatory damages at approximately $5.7 million. In March 2002 the United States Court of Appeals for the Eighth Circuit reversed and remanded the case, *see* 285 F.3d 756 (8th Cir.2002). The retrial is set for early–2003.

(2) *Jimmy Manus and Stephanie Manus, individually and as parents and next friend of Emily Manus, a minor, and Lauren Manus, a minor v. American Airlines, Inc.,* Case No. 4:99–CV–611 in the Eastern District of Arkansas. This case was also tried in April 2001 and the jury assessed compensatory damages at approximately $3.4 million. This case is currently on appeal to the Eighth Circuit.

(3) *Joe Rustenhaven and Mary Rustenhaven v. American Airlines, Inc.,* Case No. 4:99–CV–665 in the East-

ern District of Arkansas. This case was tried in May 2001 and the jury assessed compensatory damages at approximately $4.2 million. This case is also currently on appeal to the Eighth Circuit.

Because the other domestic Plaintiffs relinquished any right they might otherwise have had to recover punitive damages as part of their individual settlement agreements, the Plaintiffs in the three noted cases are the only individuals eligible to receive a share of any punitive damages award.

On March 28, 2002, the MDL Panel reassigned this matter to the undersigned's docket, and the Panel's order was filed with the District Court Clerk for the Eastern District of Arkansas on April 2, 2002.

As stated above, before the Court is the Defendant's Motion for Partial Summary Judgment Dismissing Plaintiffs' Claims for Punitive Damages in all Domestic Actions.[2]

## III. Summary Judgment Standard

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a

matter of law. *See Lambert v. City of Dumas*, 187 F.3d 931, 934 (8th Cir.1999). Rule 56(c) of the Federal Rules of Civil Procedure provides the summary judgment standard and states that it may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Court will view the evidence and the inferences that may be reasonably drawn from the evidence in a light most favorable to the nonmoving party. *See Lambert*, 187 F.3d at 934. Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *See id.*

The Supreme Court of the United States has explained the summary judgment rule:

Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." .... Rule 56 must be

2. Shortly after this MDL was transferred to the undersigned's docket, the Plaintiffs informed the Court during an April 17, 2002, telephonic conference that Judge Woods had indicated that the Plaintiffs would have an opportunity to present their case for punitive damages to a jury. The Plaintiffs pointed to a December 11, 2000, hearing in which Judge Woods stated:

I have read the depositions in this case in connection with some earlier pleadings. I've also read a transcript of the NTSB hearing, the public hearing. And I'm going to give the plaintiffs an opportunity to make a punitive damages case. Now, whether they can chin the pole or not will depend on the presentation of their case. But I'm going to give them that opportunity.

This statement was made four months prior to the filing of the instant motion for partial

summary judgment, and before the parties had briefed and otherwise argued the issues. The Court does not view Judge Woods' statement as any kind of advanced ruling on the issues raised in the instant motion. Furthermore, the instant motion was pending before Judge Woods for almost one year prior to his death. If he had already determined that summary judgment on the punitive damages question was not appropriate, it is reasonable to assume that he would have promptly denied the instant motion. The Court concludes that Judge Woods' statement is nothing more than an indication that he would permit the bifurcated punitive damages case to proceed if the facts and the law supported such an award. These questions are addressed in the instant order.

construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal citations omitted).

The Supreme Court has provided further guidance on the summary judgment procedure. The mere existence of a scintilla of evidence in support of a non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, the relevant standard of proof at trial must be taken into account. *See id.* at 254, 106 S.Ct. 2505.

## IV. Factual Background

On June 1, 1999, an American Airlines MD–82 jet aircraft, one of the MD–80 series of jet aircrafts, being operated as Flight 1420, was scheduled to depart from Dallas/Fort Worth International Airport ("DFW") for Little Rock National Airport ("LIT"). The scheduled departure time was 2028, with a scheduled arrival time of 2141.[3] However, Flight 1420 was delayed more than two hours and did not depart DFW until 2253.[4] The flight carried 145 individuals: 139 passengers, four flight attendants and two pilots: Captain Richard Buschmann and First Officer Michael Origel.

Captain Buschmann, the pilot-in-command of Flight 1420, was a 1972 graduate of the United States Air Force Academy and had spent seven years as a military aviator before being hired by the Defendant in 1979. He had accumulated over 10,000 hours of total flying time, with over 5500 of those hours in the MD–80 series. In 1998 he was designated an MD–80 series check airman.[5] In January 1999 he was selected as one of the chief pilots at Defendant's Chicago crew base.[6] He had recently decreased his flying schedule because of the chief pilot duties and did not maintain a full flight schedule.[7]

Captain Buschmann had never before been involved in an aviation accident, had never received a Federal Aviation Administration ("FAA") violation, and had never been the subject of an FAA investigation

---

**3.** All times are Central Daylight Time.

**4.** The aircraft scheduled for use on the flight was delayed into DFW due to weather, and a substitute aircraft had to be located.

**5.** Check airmen, designated by an air carrier with approval from the Federal Aviation Administration, examine other airmen to determine their proficiency with respect to procedures, techniques and general competence.

**6.** According to the Defendant's flight manual, chief pilots are selected based on leadership skills, communication skills, compatibility with other chief pilots, educational background, flying experience and company achievements.

**7.** Captain Buschmann nonetheless complied with all training and currency requirements promulgated by the Defendant and the Federal Aviation Administration. He logged over 14 hours of flight time in May 1999, the month preceding the accident, and had last flown five days prior to the accident. He had flown 411 hours in the twelve-month period preceding the accident. In contrast, the Plaintiffs note that a regular line pilot will fly approximately 70 flight hours each month. At the time of the crash, the Court notes that Captain Buschmann was acting solely in his capacity as a line pilot and was not fulfilling any functions or duties as a chief pilot. At the Chicago base each chief pilot rotated flying the line for one month each year.

or enforcement action. There is no evidence suggesting that at the time of the accident he was in poor physical, emotional or psychological health, or that he was experiencing financial problems.

First Officer Origel was the first officer, or co-pilot, for Flight 1420. He had logged approximately 4300 hours of total flight time, and had begun work for the Defendant in January 1999, five months prior to the accident. He had 200 hours of flight time in MD–80 series jet aircrafts. The Court notes, too, that he had never been involved in an aviation accident, had never received an FAA violation, and had never been the subject of an FAA investigation or enforcement action.

First Officer Origel testified that prior to departure all systems on the aircraft were in proper working condition. Before departure the Defendant's flight dispatcher for Flight 1420, William Trott, provided the flight crew with preflight paperwork, including information pertaining to weather, the aircraft, the route and alternative airfields.[8]

Captain Buschmann reviewed the flight plan and preflight paperwork prior to departure. The weather information provided the current and forecast weather for the flight route from DFW to LIT. The report indicated a possibility of thunderstorms in the vicinity of Little Rock at the estimated time of arrival. Specifically, the report noted a Convective SIGMET[9] issued by the National Weather Service that warned of severe thunderstorms, hail and high wind gusts moving through portions of Arkansas, Oklahoma and Texas. The weather report also noted a SIGMEC[10] that forecast widely scattered thunderstorms over portions of Texas, Louisiana, Arkansas and Oklahoma moving east at 20 knots. The Terminal Aerodrome Forecast published by the National Weather Service for LIT for Flight 1420's expected time of arrival, based upon the delayed departure time, forecast thunderstorms with winds from 230 degrees at 12 knots gusting to 20 knots and visibility greater than 6 miles, with temporary conditions of variable winds at 25 knots gusting to 40 knots with visibility 3 miles. Captain Buschmann and First Officer Origel discussed prior to departure the weather reports and the option of proceeding to an alternate airport if the need arose. Captain Buschmann signed the flight plan, thereby acknowledging the weather conditions.

Flight 1420 departed the DFW gate at 2240 and took off at 2253. At 2254 Mr. Trott sent a text message regarding weather conditions to the flight crew. The message stated:

> RIGHT NOW ON RADAR THERE IS A LARGE SLOT TO LIT. [THUNDERSTORMS] ARE ON THE LEFT AND RIGHT AND LIT IS IN THE CLEAR. SORT OF LIKE A BOWLING ALLEY APPROACH. [THUNDERSTORMS] ARE [MOVING EAST/NORTHEAST TOWARD] LIT AND THEY MAY BE A FACTOR FOR OUR ARRIVAL. I SUGGEST

---

8. Mr. Trott was employed at the Defendant's Systems Operations Center in Fort Worth, Texas. He had obtained his flight dispatch certificate in 1989, and had worked for the Defendant since 1996. The Federal Aviation Regulations require the dispatcher to provide the pilot-in-command with "all available current reports" regarding weather. *See* 14 C.F.R. § 121.601.

9. A Convective SIGMET is a weather advisory issued by the National Weather Service concerning weather significant to aircraft operations. Convective SIGMET advisories can warn of tornadoes, thunderstorms and large hail.

10. A SIGMEC is a weather advisory issued by the Defendant's Weather Service that warns of weather that might affect the safety of Defendant's flight operations.

EXPEDITING OUR [ARRIVAL] IN ORDER TO BEAT THE [THUNDERSTORMS] TO LIT IF [POSSIBLE].

First Officer Origel testified in his deposition that in response to this message the flight crew decided not to unnecessarily delay the flight to LIT; however they did not believe it was necessary at this time to alter the flight plan or increase the aircraft's speed.

At 2257 the flight crew requested the updated LIT weather information, and were provided the same report they received prior to departure, as this was still the most current report available.

At 2301 and 2304, Convective SIGMET 15C was broadcast by the FAA's Forth Worth Air Route Traffic Control Center. The SIGMET forecast severe thunderstorms, hail and high gusting winds for portions of Arkansas and Oklahoma. Little Rock was on the eastern edge of the defined forecast area.

At 2308 Mr. Trott received a message from Flight 1420 advising that FAA Air Traffic Control had rerouted the flight, thus adding approximately five minutes to the flight time. At 2311 Mr. Trott sent Flight 1420 a text message with revised fuel figures and divert field information.

En route the flight crew monitored the weather conditions visually and with their airborne weather radar. First Officer Origel testified that both he and Captain Buschmann used the airborne radar to monitor any convective weather along their flight path and in Little Rock. During the last thirty minutes of the flight the flight crew discussed the weather situation: [11]

2320:56 First Officer Origel: "This stuff is working out pretty well. [Unintelligible] get ahead of that stuff."

2321:40 Captain Buschmann: "[Unintelligible], we're almost down to max landing weight."

2321:50 Captain Buschmann: "We'll be there."

2321:52 First Officer Origel: "Yeah."

. . .

2322:57 Captain Buschmann: "We're right on the edge of this [unintelligible]."

. . .

2324:20 Captain Buschmann: "Boy, this is too much return."

. . .

2325:43 Captain Buschmann: "We got to get over there quick."

2325:48 First Officer Origel: "I don't like that. . . . That's lightning."

2325:56 Captain Buschmann: "Sure is."

2326:20 First Officer Origel: "Oh."

2326:36 Captain Buschmann: "That's about as far as we can go."

2326:37 First Officer Origel: "Yeah, I would say right about. Maybe a little bit more and that's about it. We could start down here pretty soon."

2326:45 Captain Buschmann: "I'm gonna ask her to come [unintelligible]. . . ."

2326:48 Captain Buschmann: "This is the bowling alley right here."

2326:50 First Officer Origel: "Yeah, I know."

2326:55 Captain Buschmann: "In fact those are the city lights straight out there."

2326:57 First Officer Origel: "That's it."

2327:03 First Officer Origel: "Want to go down?"

2327:05 Captain Buschmann: "Uuh, not just yet . . . but, pretty soon."

---

**11.** The cockpit voice recorder only provides dialogue from the last thirty minutes of the flight.

The flight crew planned its descent into LIT. As they began the initial approach, anticipating turbulence, Captain Buschmann requested that the flight attendants finish their duties quickly so that they could take their seats. At 2327:27, Captain Buschmann told the Flight 1420 passengers via the public address system:

We're now just uh, eighty miles from the airport and we have started our descent uh, toward it. Quite a light show off the left hand side of the aircraft. We'll be passing that on our way toward Little Rock uh, and we should be landing here in about uh, probably about twenty minutes. I'm gonna have to slightly over-fly the airport in ... order to turn back around to land. It's been a pleasure having you on board for this short flight and I'd like to take this opportunity to thank you for flying American Airlines.

At 2328:26 Captain Buschmann, observing the weather conditions, told First Officer Origel: "We gotta get there quick." First Officer Origel agreed and they again discussed having the flight attendants sit down early because "it's gonna get a little bumpy." Beginning at 2329:44 the following discussion took place in the cockpit:

2329:44 First Officer Origel: "Yeah, that alley's getting big ... closing to the west."

2329:48 Captain Buschmann: "Yeah it is."

2329:49 First Officer Origel: "[Unintelligible] be okay."

2329:52 First Officer Origel: "I say we get down as soon as we can."

The flight crew then went through part of the landing checklist. At 2331:39 the following discussion took place in the cockpit:

2331:31 First Officer Origel: "Breaking out of this crud. Good.... Doing good."

2331:52 First Officer Origel (after seeing a lightning strike): "Whoa. Looks like it's movin' this way though."

2331:54 Captain Buschmann: "Yeah [unintelligible]."

2331:55 First Officer Origel: "[Unintelligible.]"

2332:05 Captain Buschmann: "[Unintelligible] just some lightning straight ahead."

2332:11 First Officer Origel: "[Unintelligible] think we're gonna be okay. Right there."

2332:28 Captain Buschmann: "Down the bowling alley."

2332:44 First Officer Origel: "As my friends would say, California cool."

2332:48 Captain Buschmann: "Cool."

2332:49 First Officer Origel: [sound of chuckle]

2332:51 Captain Buschmann: "Peachy."

2332:52 First Officer Origel: "Exactly."

The flight crew checked in with the LIT Air Traffic Controller, Kenneth Kaylor, at 2334:03. At 2334:09 the Controller informed the flight crew that there was "a thunderstorm just northwest of the airport moving uh, through the area now." The Controller also reported the two-minute centerfield wind average as being from 280 degrees, at 28 knots with gusts of 44 knots.[12]

12. The Court notes that Captain Cecil Ewell, the Defendant's Vice President of Flight at the time of the accident, testified that at this point he would have discontinued the approach. However, he did not testify that Captain Buschmann should have necessarily discontinued the approach:

Q—What possibilities are there to explain his decision both to initiate and continue this approach to a landing, other than he missed the obvious or chose to land in a thunderstorm that he knew was there? What other possibilities are there?

...

At 2334:21 First Officer Origel stated to the Controller that he saw lightning. He requested the wind information again. At 2334:26 the Controller reported winds from 290 degrees at 28 knots, gusts of 44 knots. After hearing this the flight crew discussed what the crosswind limitations were and made an initial calculation of whether the crosswind component was within the Defendant's limits.

2334:36 Captain Buschmann: "Right near the [crosswind] limit."

2334:37 First Officer Origel: "Yeah, it's uh, forty degrees off. What's our crosswind [unintelligible]."

2334:44 Captain Buschmann: "Thirty."

2334:48 First Office Origel: "No, that's that's [unintelligible]. You're, not out of the limits because of the angle [unintelligible], but it's pretty close."

2334:54 Captain Buschmann: "Yeah."

. . . .

2336:02 Captain Buschmann: "Thirty knots is the crosswind limitation but . . . thirty knots is the . . . wet, well."

2336:06 First Officer Origel: "That's the dry."

2336:07 Captain Buschmann: "Yeah, dry."

2336:08 First Officer Origel: "What about wet?"

2336:09 Captain Buschmann: "Wet. . ."

2336:10 First Officer Origel: "Yeah."

2336:10 Captain Buschmann: ". . . is twenty."

2336:11 First Officer Origel: "Ah, it's twenty five. Aw, what the [expletive]."

Beginning at 2337:15 the following discussion took place in the cockpit:

2337:15 First Officer Origel: "See the airport?"

2337:16 Captain Buschmann: "See it blinking out there."

2337:18 First Officer Origel: "[Unintelligible] to the north."

2337:18 Captain Buschmann: "Straight ahead."

2337:19 First Officer Origel: "Well there's a couple of runways here so, the problem is we're sixteen miles south of the VOR and the airport's another five miles past that."

2337:27 Captain Buschmann: "All right. Doesn't matter."

2337:30 First Officer Origel: "So we've still got a little ways to go. . . . Bad part. . . . I'll tell you what. I'm gonna stay on the run. . . The VOR till we get a little closer."

2338:20 Captain Buschmann: "Oh I think I see, I see where it is."

2338:23 First Officer Origel: "Yeah, it's on [unintelligible]."

A—Well, I don't know—everyone makes different judgments. You make them; I make them. Everybody in this room makes different judgments. Some of them right; some of them wrong. Now, Captain Buschmann made the decision to continue. They obviously were not in any turbulence. They had a stabilized approach. The airspeed wasn't bouncing around a lot. He obviously, in his mind, felt like—that he could make it, that the thunderstorm was not at the airport. That's the only explanation that I can give you.

. . .

Q—So would you agree that 15 minutes before the crosswind landing limitation violation, there was sufficient information available to the crew of Flight 1420 that a decision to avoid would have been appropriate?

A—A decision to avoid certainly could have been made at that point. I would have made it.

Q—And it would have been prudent, wouldn't it?

. . .

A—Well, I'm not going to judge that. At that point in time, that's when I would have made my decision. That's my—that's my answer.

2338:24 Captain Buschmann: "It's straight up there, yeah. . . ."

2338:25 First Officer Origel: "[Unintelligible] blinking [unintelligible]."

2338:27 Captain Buschmann: "It looks like there's stratus a layer, right over there."

2338:35 First Officer Origel: "[unintelligible] I definitely got [unintelligible]. I'll show you this later."

2338:53 Captain Buschmann: "He said there was a storm just northwest of the field?"

2338:55 First Officer Origel: "He said northwest."

2338:56 Captain Buschmann: "Yeah."

2338:57 First Officer Origel: "Lightning strike he said storm, uh."

The flight crew anticipated landing on Runway 22L, and the controller confirmed this. A landing on Runway 22L would not be a straight shot for Flight 1420; an aircraft approaching from the southwest, as Flight 1420 was from DFW, would need to partially circle LIT in order to land on said runway. Flight 1420 was in the process of circling LIT from the south.

At 2339:05 the Controller asked the flight crew about the weather and landing on Runway 22L: "American fourteen twenty uh, [your] equipment's a lot better than uh, what I have. How's the final for [Runway 22L] lookin'?" First Officer Origel replied that the flight crew had the airport in sight and that the flight crew thought that the thunderstorm was further away than what the Controller had thought: "[W]e can uh, see the airport from here. We can barely make it out but uh, we should be able to make [Runway 22L]. Uh, that storm is moving this way like your radar says it is but a little bit farther off than you thought." The Controller did not challenge this assessment, and only inquired whether Flight 1420 would attempt a "visual approach." The flight crew indicated that it would not attempt a visual approach, but an instrument approach.

At 2339:31 the Controller again provided the flight crew with the two-minute centerfield average wind direction and speed: 330 degrees at 11 knots. At 2339:44 the Controller reported a low-level windshear alert, reporting centerfield winds as 340 degrees at 10 knots, the north boundary wind as 330 degrees at 25 knots, and the northwest boundary winds as 010 degrees at 15 knots.[13]

After hearing this Captain Buschmann concluded that landing on Runway 22L would mean landing with a tailwind. The flight crew requested to land on Runway 4R in order to land with a headwind.[14] Landing on Runway 4R meant landing on the same runway, but from the opposite direction. Because Flight 1420 had already begun circling LIT in an attempt to land on Runway 22L, the aircraft would have to circle back to land on Runway 4R, thus adding approximately another five minutes to the flight time. The Controller granted the flight crew's request to land on Runway 4R. While circling back First Officer Origel attempted from his right side seat to help Captain Buschmann visually locate the runway. Captain Buschmann was struggling to maintain visual contact.

At 2342:26 the Controller advised the flight crew that the second part of the

---

**13.** The low-level windshear alert system at LIT consisted of six wind sensors at different locations around the airport. The Controller provided the flight crew with information from three of the sensors. The Aeronautical Information Manual notes that windshear can be hazardous to aircraft operations at low altitudes on approach to airports.

**14.** Landing with a headwind decreases an aircraft's groundspeed resulting in a reduced landing rollout distance.

storm was moving through the vicinity of the airport, with wind from 340 degrees at 16 knots, with gusts of 34 knots. At 2342:54 First Officer Origel stated to Captain Buschmann: "[Expletive], it's going right over the ... field." At 2343:04 the Controller inquired whether the flight crew desired a visual approach or an instrument approach. First Officer Origel indicated a visual approach, "if we can do it."

At 2343:11 the Controller cleared Flight 1420 for a visual approach to Runway 4R. Between 2343:26 and 2343:49 Captain Buschmann informed First Officer Origel that he still could not see the runway. First Officer Origel attempted to point it out to Captain Buschmann. At 2343:59 the Controller cleared Flight 1420 to land and informed the flight crew that the wind was at 330 degrees at 21 knots.

At 2344:19 Captain Buschmann stated: "See we're losing it. I don't think we can maintain visual." First Officer Origel replied, "yeah." At 2344:30 First Officer Origel radioed the Controller that the flight crew had lost visual contact. He stated that "there's a cloud between us and the airport. We just lost the field and I'm uh, on this vector here. I have the uh, basically last vector you gave us, we're on kind of a dog leg it looks like." At 2344:39 the Controller offered to vector the aircraft for an instrument approach to Runway 4R. At 2344:43 the flight crew agreed to an instrument approach.

Between 2345 and 2350 five to six lightning strikes occurred within two nautical miles of Runway 4R, and the rainfall in the area was steadily increasing. Flight 1420 was equipped with an airborne radar capable of displaying the location and intensity of thunderstorms. The aircraft's radar de-

picted precipitation as green, yellow or red, depending on intensity, with red being the most intense. The radar at the LIT Air Traffic Control Tower, by contrast, was monochromatic and capable of showing only a "blob" outline for areas of precipitation without any variation for intensity. As noted, at 2339:05 the Controller stated to the flight crew: "American fourteen twenty ... [your] equipment's a lot better than ... what I have."

The Defendant's internal procedures prohibit a pilot from flying into an area producing a red radar return. The Doppler radar images for Little Rock at the time of Flight 1420's descent and touchdown show the airport covered with red radar returns with precipitation levels exceeding 60 DBZ, corresponding to a VIP level 6 intensity thunderstorm.[15] While First Officer Origel testified that he never saw red on the aircraft's radar, Defendant's expert Kevin Droegemeier testified, based on the available weather data, that "it's likely [First Officer Origel was] mistaken." (For purposes of this summary judgment motion the Court accepts that the weather conditions produced a red radar return.)

At 2344:43 the flight crew commenced its final instrument approach. The flight crew lamented not being able to attempt a visual approach:

> 2345:07 First Officer Origel: "[Expletive], [unintelligible] we had it."
>
> 2345:09 Captain Buschmann: "Yeah. I just, I never saw the runway."
>
> 2345:11 First Officer Origel: "No no, it's okay. I [unintelligible]."
>
> 2345:15 Captain Buschmann: "I hate droning around visual at night in weath-

---

**15.** VIP levels correspond to the "video integrator and processor" intensity recorded on the Dopler radar. The National Weather Service rates thunderstorms from VIP levels 0 to 6, with 6 being the highest. A VIP level 6 thunderstorm is defined as "extreme" with rainfall exceeding 5.67 inches per hour.

er without, having some clue where I am."

2345:23 First Officer Origel: "Yeah but, the longer we go out here the . . ."

2345:24 Captain Buschmann: "Yeah, I know."

2345:29 First Officer Origel: "See how we're going right into this crap."

2345:31 Captain Buschmann: "Right."

2345:47 First Officer Origel (radioing to Controller): "And approach American fourteen twenty, I know you're doing your best sir. We're getting pretty close to this storm. We'll keep it tight if we have to."

. . . .

2346:11 First Officer Origel: "See we're right on the base of these clouds so . . . ."

2346:13 Captain Buschmann: "Yeah."

2346:14 First Officer Origel: ". . . it's not worth it."

2346:20 First Officer Origel: "Two seven zero, two thousand three hundred?"

2346:23 Captain Buschmann: "Yes sir. [Unintelligible] where I am."

The flight crew continued with its instrument approach. At 2346:52 Captain Buschmann stated to First Officer Origel: "we're goin' right into this."

Also at 2346:52 the Controller told the flight crew: "right now we have uh, heavy rain on the airport. The uh, current weather on the ATIS is not correct. I don't have new weather for ya, but the uh, visibility is uh, less than a mile." The Controller informed the flight crew that the runway visual range for Runway 4R was 3000 feet and issued a wind report of 350 degrees at 30 knots, gusts to 45 knots. Captain Buschmann inquired of First Officer Origel whether the reported runway visibility was above the minimum visibility needed to commence the instrument approach. First Officer Origel informed Captain Buschmann that 3000 feet was above the minimum visibility needed, and

that everything was "fine." The following discussion took place:

2347:08 Controller: "Runway four right cleared to land. The wind at [350 degrees at 30 knots, gusts to 45 knots]."

2347:10 Captain Bushmann: "Can we land?"

2347:16 First Officer Origel [radioing to Controller]: "Zero three zero at four five American fourteen twenty."

2347:19 First Officer Origel: "[Unintelligible] zero forecast right down the runway."

2347:22 Captain Buschmann: "Three thousand [runway visual range]. We can't land on that."

2347:24 First Officer Origel: "Three thousand if you look at uh . . ."

2347:27 Captain Buschmann: "What do we need?"

2347:28 First Officer Origel: "No it's twenty four hundred [runway visual range]."

2347:29 Captain Buschmann: "Okay, fine."

2347:30 First Officer Origel: "Yeah, we're doing fine."

2347:31 Captain Buschmann: "All right."

At 2347:36 the flight crew began to reconfigure the aircraft for landing by lowering the wing flaps and activating the landing gear. At 2347:53 the Controller issued a second windshear alert to the flight crew. The Controller stated: "Windshear alert, center field wind [350 degrees at 32 knots, gusts to 45 knots]. North boundary wind [310 degrees at 29 knots]. Northeast boundary wind [320 degrees at 32 knots]." At 2348:04 First Officer Origel asked Captain Buschmann if he wanted the flaps set at 28 degrees. In response Captain Buschmann stated to add 20 knots to the approach speed, pursuant to the Defen-

dant's operating manual as to how to approach in gusting winds.

At 2348:13 the Controller stated that Runway 4R's runway visual range had decreased from 3000 feet to 1600 feet. The flight crew decided to continue with the final approach. The following discussion took place:

> 2348:13 Controller: "American fourteen twenty, the runway four right [runway visual range] now is [1600 feet]."
> 2348:19 Captain Buschmann: "Aw [expletive]. Well we're established on the final."
> 2348:21 First Officer Origel: "We're established we're inbound, right."
> 2348:25 First Officer Origel [radioing to Controller]: "Okay, American fourteen twenty, we're established inbound."
> 2348:27 Controller: "American fourteen twenty roger. Runway four right, cleared to land, and the wind, [340 degrees at 31 knots]. North ... boundary wind is [300 degrees at 26 knots]. Northeast boundary wind [is 320 degrees at 25 knots]. And the four right [runway visual range] is [1600 feet]."

The "decision altitude" for an ILS instrument approach to Runway 4R was 460 feet above mean sea level ("MSL"),[16] meaning that the flight crew should not descend below 460 feet above MSL unless certain prescribed conditions were met, including seeing the approach lighting system, the runway, or the runway lighting

system.[17] At 2348:55 Captain Buschmann stated: "I don't see anything, Lookin' for 460." At 2349:11 the Controller reported to the flight crew that the centerfield wind was from 330 degrees at 28 knots.[18] At 2349:13 Captain Buschmann stated: "this is a can of worms." At 2349:25, with the aircraft at 980 feet above MSL, and thus above the decision altitude. First Officer Origel informed Captain Buschmann that he had visually located the runway. He stated: "I got the right runway in sight. You're right on course. Stay where you're at." Captain Buschmann replied: "I got it, I got it." At this time the aircraft was slightly over two miles from the threshold of Runway 4R.

At 2349:33 the Controller reported to the flight crew that the centerfield wind was 330 degrees at 25 knots. At 2349:54 the Controller reported to the flight crew that the centerfield wind was 320 degrees at 23 knots.[19] These were the final wind reports issued by the Controller to the flight crew.

Less than thirty seconds before touching down it was evident to the flight crew that Flight 1420 was "off course." The following discussion took place:

> 2349:57.5 Captain Buschmann or First Officer Origel: "Aw [expletive], we're way off course. We're way off."
> 2349:58.5 Captain Buschmann or First Officer Origel: [Unintelligible].

---

16. The "decision altitude" is the specified altitude in a precision approach at which a missed approach must be initiated if the required visual reference to continue the approach has not been established.

17. 460 feet above mean sea level is 200 feet above the elevation of the ground at the touchdown zone.

18. However, the actual centerfield wind at this time was from 310 degrees at 23 knots. The Court notes that the Controller repeatedly

provided the flight crew only the low-level windshear alert system two-minute average centerfield winds instead of centerfield instantaneous or ten-second average winds.

19. *See supra* note 18. The actual centerfield wind for these two times was 310 degrees at 23 knots and 300 degrees at 23 knots, respectively. Because the instantaneous centerfield winds were not reported to the flight crew, Flight 1420, unbeknownst to the flight crew, landed with a slight tailwind component.

2350:01.4   First Officer Origel: "We're way off."

2350:02.5   Captain Buschmann: "I can't see it."

2350:05.4   First Officer Origel: "Got it?"

2350:06.1   Captain Buschmann: "Yeah I got it."

Flight 1420 had drifted right of the runway's centerline due to a crosswind. In response, between 2350:08.9 and 2350:19.3 First Officer Origel made deviation call-outs and Captain Buschmann attempted to realign the aircraft with the runway. At 2350:13.75 and 2350:15.16 the aircraft's automated Ground Proximity Warning System broadcast "sink rate" warnings, indicating that the aircraft was descending at an excessive rate of speed.

At 2350:21.2 Flight 1420 touched down on the runway in the touchdown zone.[20] slightly right of centerline in a slight left "crab" position.[21] The Controller testified that the approach and touchdown appeared normal from his perspective, and that he did not notice anything unusual about the first half of the landing rollout. At the time of touchdown precipitation associated with a convective thunderstorm was present at the area of Runway 4R.

After touchdown the flight crew encountered extreme difficulty maintaining directional control of the aircraft. First Officer Origel testified that he felt the aircraft start to slide to the right. The cockpit voice recorder reveals the following discussion and sounds:

**20.** The "touchdown zone" is the first 3000 feet of the runway beginning at the threshold.

**21.** A "crab" is a technique used to offset the effects of wind drift caused by a crosswind. It requires the pilot to point the nose of the aircraft into the wind to overcome the effects of the crosswind in an effort to maintain a desired flight path over the ground.

**22.** This was in accordance with the Defendant's operating manual. When faced with a

2350:23.2   First Officer Origel: "We're down."

2350:25.4   First Officer Origel: "We're sliding."

2350:27.1   Captain Buschmann: "[Expletive] . . . [expletive]."

2350:32.9   Captain Buschmann or First Officer Origel: "On the brakes."

2350:34.2   Captain Buschmann or First Officer Origel: "Oh [expletive]."

2350:34.6:   sound similar to increase in engine RPM

2350:36.2   Captain Buschmann or First Officer Origel: "Other one, other one, other one."

2350:42.0   Captain Buschmann or First Officer Origel: "Aw [expletive]."

2350:42.7   Captain Buschmann or First Officer Origel: "[Expletive] [expletive]."

2350:44.9:   sound of impact

2350:45.4   Captain Buschmann or First Officer Origel: "[Expletive] [expletive]."

2350:48.0:   sound of several impacts

2350:49.1:   end of recording

Captain Buschmann had deployed the thrust reversers and brakes in an effort to stop the aircraft from sliding. Notwithstanding his efforts Flight 1420 continued to slide to the right and did not decelerate normally. Captain Buschmann cycled out of reverse thrust in an attempt to regain directional control of the aircraft.[22] Once the drift to the right was arrested and the aircraft began to track left back to the centerline. Captain Buschmann again

slippery runway and a crosswind, a pilot is given the following directive: "If weathervaning or moving to the downwind side of the runway, release breaks and reduce or stop reversing to regain control. Forward thrust can push airplane onto the desired runway track even with little or no traction. Use of forward thrust must be tempered by runway remaining."

used reverse thrust to slow the aircraft. However, the aircraft did not slow. It tracked left past the runway's centerline to the point that both main landing gear departed the runway surface on the left edge while the nose gear remained on the runway. The aircraft continued moving forward and eventually overran the end of Runway 4R.

After overrunning the end of the runway the aircraft struck a non-frangible approach light stanchion and broke apart. Captain Buschmann and ten passengers received fatal injuries and many of the remaining passengers sustained serious injuries. The aircraft was destroyed.

The Court notes that MD–80 series aircraft have both flight spoilers and ground spoilers. The four flight spoiler panels, the two most outermost panels on each wing, assist the ailerons in lateral control during flight and can be used as speed brakes inflight or on landing. The two ground spoiler panels, one on each wing located inboard of the flight spoiler panels, operate to supplement the flight spoilers during ground operations. Their use increases braking efficiency. Ground spoilers operate only during landings and rejected takeoffs.

The spoilers, once deployed, decrease the aerodynamic lift of the wing and transfer more of the weight of the aircraft to the wheels, thereby improving braking. The spoilers can be armed inflight to deploy automatically upon landing, or they can be deployed manually once on the ground. The Defendant's procedures require flight crews to arm the spoilers to deploy automatically upon landing; only if the spoilers fail to deploy automatically is the flight crew to deploy them manually.

The spoilers on Flight 1420 were never deployed. The cockpit voice recorder does not indicate that First Officer Origel ever acknowledged verbally, at least in the last thirty minutes of the flight, that the spoilers had been armed. Post-accident the NTSB found all of the aircraft's ground spoilers to be in the unarmed position.

The Court notes that, on this summary judgment record, it cannot be reasonably disputed that had the spoilers automatically deployed or had they been deployed manually on touchdown, the aircraft would have stopped on the runway and the accident would not have occurred. The Plaintiffs acknowledge that "even if the runway had been dry on June 1, 1999, the crew's failure to deploy the spoilers would have caused the plane to crash." The determination that had the spoilers been deployed the crash of Flight 1420 would not have occurred is based upon the following:

(1) Defendant's expert Larry Pullen testified as follows in his deposition:

Q—[I]n your opinion, if the spoilers had been armed, would the aircraft have gone off the runway?

A—No.

Q—And what's the basis for that opinion?

A—His stopping—the returning forces on the airplane would have been such that I think the airplane would have stopped.

Q—So it is your opinion that the real—that the direct cause of the airplane going off the runway was the fact that the spoilers did not deploy?

A—No.

Q—But you agree that, that if the spoilers had been deployed, the airplane would not have gone off the runway?

A—I think that's correct.

(2) Defendant's expert David Kohlman opined in his report: "It is logical to assume that if the spoilers had been deployed, the directional control of the airplane would have been increased significantly, because the

weight on the main and nose tires would have been increased by a factor of almost four at touchdown. This would result in increased tire traction and cornering forces for both directional stability and control. Without the loss of directional control, the crew would have been able to maintain continuous reverse thrust during the entire landing run and ... would have stopped well short of the end of the runway." Dr. Kohlman also testified as follows in his deposition:

Q—Why did this airplane crash, in your opinion?

A—In my opinion, the cause of the crash was the failure of the crew to either arm the spoilers for autoactuation or to manually deploy the spoilers after touchdown.

. . .

Q—All things being equal in this case, had the spoilers been deployed at least on touchdown or shortly thereafter, the aircraft would have stopped on the runway?

A—Yes, sir.

Q—You believe that very firmly?

A—Yes, sir.

Q—Even with the water that was on the runway?

A—Absolutely.

Q—No question about that?

A—That's correct.

. . .

Q—Had the spoilers been deployed, you think the airplane would have gotten stopped?

A—My data show clearly that given the actual braking capability demonstrated on that runway, if the spoilers had been deployed, the airplane would have stopped before the end of the runway.

. . .

Q—In the presence of the actual water on the runway that night in Little Rock, you believe had the spoilers been deployed for automatic activation or manually deployed, the aircraft would have stopped on the runway?

A—Absolutely.

Q—No question?

A—No question in my mind.

. . .

Q—Can you tell the jury that had the spoilers been deployed, they would have been able to have kept the airplane within the lateral parameters of the runway?

A—Yes.

Q—What is the answer?

A—The answer is yes.

Q—And why do you believe that?

A—Two reasons. One, controlability [sic] through the landing gear, the contact of the landing gear, the contact of the landing gear with the runway, is greatly improved with spoilers because there's more weight on the gear. Secondly, with more controlability [sic] through the landing gear and more braking, due to both aerodynamic braking with the spoilers up and wheel-braking, the crew would not have had to use emergency levels of [Engine Pressure Ration] to slow the airplane down. They could have stopped at the normal 1.3 and kept that continuous and maintained aerodynamic control of the airplane. Finally, the airplane did not go off the edge of the runway until the last couple or 300 feet. By that point in time, my calculations show the airplane would have stopped.

. . .

Q—Regardless of the depth of the water on the runway, it's your belief that under the conditions present on

the night of June the 1st if they'd have just put the spoilers down, they'd have stopped?

A—That is correct.

Q—That is correct?

A—Yes, sir.

Q—Okay. Whether or not there was standing water on the runway on the night in question is a nonissue if the spoilers had been deployed.

A—Yes, sir.

Q—Whether there were frangible structures at the end of the runway, again, is a nonissue if the spoilers had been deployed.

A—That's correct.

Q—The adequacy, or lack thereof, of emergency response is a nonissue if the spoilers had been activated?

A—That's correct.

Q—When I say "activated," I mean activated or deployed.

A—Certainly, yeah. They would have not needed that kind of response with spoilers.

. . .

Q—Dynamic hydroplaning is a nonissue in this case had the spoilers been deployed; is that correct?

A—Yes, I believe that's correct.

Q—Do you think there was dynamic hydroplaning in this case for any appreciable period of time?

A—Not enough to significantly affect the outcome.

Q—Even with the spoilers not deployed?

A—Well, whatever dynamic hydroplaning there may have been made a bad situation worse. But if the spoilers had been deployed, it would not have been an issue.

Q—The runway safety area at the end of the runway, whether it was adequate or inadequate is a nonissue had the spoilers been activated. Do you agree with that?

A—Yes, sir.

(3) The National Transportation Safety Board's Aircraft Performance—Group Chairman's Aircraft Performance Study, dated December 18, 2000, wherein the NTSB concluded that Flight 1420 would have stopped on the runway about 700 feet from the end of the runway had the spoilers been deployed and reverse thrust of 1.3 Engine Pressure Ratio had been used (assuming all other parameters from the Flight 1420 rollout, including the runway conditions and the braking profile, remained the same).

(4) Boeing's Submission to the National Transportation Safety Board for the American Airlines 1420 Little Rock and American Airlines 9503 Palm Springs Investigations, dated June 25, 2001, wherein Boeing concluded: "In both the Little Rock and Palm Springs events, the airplanes' spoilers were not deployed during the landing rollout. The spoilers are designed to reduce the lift on the wing, placing more weight on the landing gear and providing additional aerodynamic drag. For any given runway friction condition, the amount of braking and cornering force available is directly proportional to the weight on the landing gear. Therefore, rapid extension of the spoilers is essential to developing maximum braking, cornering, and drag forces at high speeds. As noted in the NTSB performance studies, the stopping distances would have been significantly reduced and cornering ability significantly enhanced if the spoilers had been used. Indeed, in the Little Rock accident, the available runway length would have been sufficient to stop the airplane had

the spoilers been deployed after touchdown."

Therefore, the Court accepts as not reasonably disputed the fact that the aircraft would not have left the runway and crashed into the light stanchion had the spoilers been automatically or manually deployed.[23]

The Court also notes the following. The Defendant's Flight Manual, dated April 7, 1999, provides the following as regards wind landing limits:

Wind Landing Limits

A. Pilots shall secure the latest surface wind direction and velocity prior to making a landing at an airport.

B. Except in an emergency, landings will not be attempted whenever winds gusts exceed 50 knots.

23. On the question of whether the accident would not have occurred had the spoilers been armed or otherwise deployed, the Court notes that the Plaintiffs have offered no expert evidence to the contrary. Rather, the Plaintiffs rely on the deposition testimony of William Melvin, one of the Defendant's experts, for the proposition that the aircraft may have left the runway even if the spoilers had been deployed. Mr. Melvin testified as follows in his deposition:

Q—All right. So when you wrote your report, you weren't even sure the spoilers were a factor in this crash, as I recall?
A—That's correct.
Q—But now you've read some of the other experts, and you think the spoilers were a significant factor?
A—Well, I didn't make that determination entirely from those other reports. I examined the flight data recorder data again, and I could not find any evidence in the flight data recorder that the spoilers had ever activated.
Q—Well, had the spoilers been deployed, do you think the airplane would have stopped?
A—On the runway?
Q—Yes sir.
A—I think that's questionable. I'm not certain.
Q—Why don't you think it would have stopped on the runway?
A—Well, because the—if it was hydroplaning as I think it was, and I don't know what level of hydroplaning was happening, but I think it's possible it still would have overrun the runway.
Q—How far?
A—I don't know.
Q—Well, since you think the airplane was hyrdroplaning, you think it would have overrun the runway, then?
A—I think it would, as long as it was hydroplaning.

Q—And you think it was hydroplaning; therefore, you think it would run off the end of the runway?
A—But as I say, I don't know the level of hydroplaning. In other words, we have not been able to quantify—I can't quantify—that the hydroplaning was a total hydroplane—dynamic hydroplaning case where the friction coefficient would have been at low levels . . 1 or less, or whether there's partial contact. And there are places—and I said so in my report. There are places in the deceleration where the deceleration rates are too great to have been just from reverse thrust alone if it had been totally hydroplaning. So certainly there were areas in the—in the path where there was some wheel contact and there was some breaking action, and in those areas the lack of spoilers would have made a significant difference.
Q—Well, I'm just trying to figure out your opinion. Bottom line, you think since there was hydroplaning for a significant period of time, it probably would have overrun the runway?
A—That's—probably, yes.

The Court concludes that Mr. Melvin's testimony is too uncertain, speculative and ambiguous on both the spoiler and hydroplaning issues to create, unsupported by other evidence, a question of fact on whether the accident would have occurred had the spoilers been automatically or manually deployed. In other words, Mr. Melvin's testimony is too vague to sufficiently contradict the expert opinions of Mr. Pullen and Mr. Kohlman, as well as the NTSB and Boeing reports. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (expert evidence must have a reliable foundation to be admissible).

C. [A chart provides: It is the Defendant's policy that the maximum crosswind component is reduced to 15 knots ·when the runway visual range is less than 4000 feet. It is the Defendant's policy that the maximum crosswind component is reduced to 10 knots when the runway visual range is less than 1800 feet.]

D. . . .

E. . . .

F. If, in the Captain's judgement [sic], environmental conditions or braking reports indicate that the runway is wet or slippery, the maximum acceptable crosswind should be reduced to 20 knots. . . .

The reported gusts speeds the Controller relayed to the flight crew exceeded the Defendant's own authorized limits.

The Defendant's minimum runway visibility to commence an approach for the instrument approach attempted by the Flight 1420 flight crew was 1800 feet runway visual range. The Defendant's procedures require that aircraft on approach be properly configured for landing by 1000 feet above the ground. First Officer Origel testified that Flight 1420 was not properly configured for landing at said altitude.

The Defendant's procedures require that before descending below a specified minimum stabilized approach altitude, 500 feet, the aircraft must be in the final landing configuration, on approach speed, on the proper flight path and at a proper sink rate, and at stabilized thrust. The conditions should be maintained throughout the remainder of the approach. First Officer Origel testified that the approach was unstable below the stabilized approach altitude in that the aircraft had drifted to the right of the runway's centerline because of the crosswind. Furthermore, at 2350:13.75 and 2350:15.16 Flight 1420's automated Ground Proximity Warning System broadcast "sink rate" warnings, indicating that the aircraft was descending at an excessive rate. The Defendant's procedures require a flight crew to abort an approach when it becomes unstabilized.

The Defendant's pilots were instructed that use of reverse thrust beyond 1.6 Engine Pressure Ratio ("EPR") will lead to a loss of effectiveness of the aircraft's rudder. The Boeing operating manual directs that reverse thrust of no more than 1.3 EPR should be used on wet runways. First Officer Origel told NTSB investigators that after touchdown Captain Buschmann applied reverse thrust as high as 1.6 to 1.8 EPR. The Flight Data Recorder shows reverse thrust levels of between 1.5 and 2.0 EPR.

The Court notes that First Officer Origel testified that Flight 1420 was sufficiently fueled that it could have returned to DFW or flown to another city, such as Nashville. Tennessee. The Court also notes deposition testimony from the Defendant's expert on cockpit crew performance, Captain Gary Wagner, that it was not prudent for the flight crew to attempt to land at LIT because of the weather conditions. Captain Wagner also opined that the only reason the flight crew would have continued past final approach was because they did not recognize the danger they were flying into. Captain Paul Railsback, Defendant's Managing Director of Flight Operations, testified that the flight crew could have aborted the approach as late as immediately prior to touchdown.

## V.   Choice of Law

The Court has not heretofore ruled as to which state or states' substantive punitive damages law controls. The Plaintiffs argue for the application of Arkansas's standard, while the Defendant contends that Texas's law controls. The Defendant also

contends that whether the Court applies Arkansas or Texas substantive punitive damages law, summary judgment in its favor is required.

Before applying the forum state's choice of law methodology, the Court must first confirm that a true conflict exists between the Arkansas and Texas substantive punitive damages laws. The Court is satisfied such a conflict exists. There are two primary differences between the Arkansas and Texas laws: (1) While the Texas legislature caps punitive damages awards at $200,000 or twice the economic damages plus non-economic damages up to $750,000, whichever is greater, *see* Tex. Civ. Prac. & Rem.Code Ann. § 41.008(b), Arkansas law does not place any such limits on punitive damages awards; and (2) while Arkansas permits the conduct of an employee acting within the scope of employment to be imputed to his or her employer for punitive damages purposes, *see J.B. Hunt Transp., Inc. v. Doss,* 320 Ark. 660, 899 S.W.2d 464 (1995), Texas provides that punitive damages may be awarded against an employer for the acts of its employee only if a "vice principal" authorizes, approves or ratifies the conduct, *see Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 388 (Tex.1997). Thus, because conflicts exist between the two states' laws the Court must make a choice of law determination.

This Court's subject matter jurisdiction is founded upon diversity of citizenship. The Eighth Circuit has held: "Federal district courts apply the choice of law rules of the state in which they sit when jurisdiction is based on diversity of citizenship." *Heating & Air Specialists, Inc. v. Jones,* 180 F.3d 923, 928 (8th Cir.1999). The Court recognizes that the punitive damages issue comes before it as part of a MDL that has consolidated various diversity cases filed not exclusively in Arkansas. However, as noted *supra,* only the domestic Plaintiffs can recover punitive damages, and all but three of the domestic Plaintiff cases have settled. The only domestic Plaintiffs that did not relinquish their ability to share in a punitive damages award are the Plaintiffs in *Chu. Manus* and *Rustenhaven.* Arkansas is the forum jurisdiction for each of these three cases, and thus the Court need only apply the Arkansas choice of law rules in determining which state or states' substantive punitive damages law will be applied.[24]

■ Arkansas has adopted Dr. Robert A. Leflar's "choice-influencing considerations" as its choice of law methodology in tort cases. *See Schlemmer v. Fireman's Fund Ins. Co.,* 292 Ark. 344, 730 S.W.2d 217 (1987); *see also* Howard Brill, *Arkansas Law of Damages* § 2–6 (3d ed.1996). The five choice-influencing considerations are:

**24.** As a threshold matter, the Court rejects the Plaintiffs' contention that the Court need not apply the Arkansas choice of law methodology because, they argue, Arkansas statutory law mandates that Arkansas substantive law applies to the crash. *Citing* Ark.Code Ann. §§ 27–116–301 & –303. The Court concludes that the two statutes, enacted in the 1940s, were not intended to resolve choice of law questions in aviation accident litigation. Rather, these statutes merely clarified that aviation accidents are to be treated as any other torts under state law. The Court recognizes that Judge Woods ruled in another case in this MDL (on the compensatory damages claim) that the two statutes circumvent the judicial choice of law mechanics. *See Sattari v. American Airlines, Inc.,* 125 F.Supp.2d 357, 362–63 (E.D.Ark.2000). However, Judge Woods did not rely on the two statutes in making choice of law determinations in two other cases within this MDL. *See Lloyd v. American Airlines, Inc.,* 118 F.Supp.2d 916 (E.D.Ark.2000); *Maddox v. American Airlines, Inc.,* 115 F.Supp.2d 993 (E.D.Ark.2000). As the punitive damages claims were bifurcated from the compensatory damages claims, the Court concludes that the law of the case doctrine does not require the Court to adhere to this aspect of the *Sattari* holding.

(1) Predictability of results;

(2) Maintenance of interstate and international order;

(3) Simplification of the judicial task;

(4) Advancement of the forum's governmental interests; and

(5) Application of the better rule of law.

*See Schlemmer,* 730 S.W.2d at 219. Case law does not suggest that any one of these factors is the more important or that some type of a balancing approach is mandated. Rather, a court applying the Arkansas methodology is merely to consider these five factors in light of the facts of an individual case.

■■■■ The parties stipulate that factors (1), (2) and (3) bear no relevance to the punitive damages issue, and the Court agrees. The predictability of results is not implicated when an action arises out of an unplanned injury. *See id.; see also Hughes v. Wal–Mart Stores, Inc.,* 250 F.3d 618, 620 (8th Cir.2001). The predictability of results pertains to whether the choice of law was predictable before the accident, not to whether the choice was predictable afterwards. *See Nesladek v. Ford Motor Co.,* 46 F.3d 734, 738 (8th Cir.1995). The maintenance of interstate order is not relevant because both Arkansas and Texas have sufficient contacts with the events of the crash. *See Hughes,* 250 F.3d at 620–21; *see also Thornton v. Sea Quest,* 999 F.Supp. 1219, 1223 (N.D.Ind.1998) (applying Arkansas choice of law rules). Finally, the judicial task would not be simplified by the application of either Arkansas or Texas law. *See id.* at 620 ("A federal district court is faced almost daily with the task of applying some state's law other than that of the forum state, and it is equally capa-

ble of resolving the dispute under [either of two states'] law."). Thus, the Court will only consider factors (4) and (5).

■■■■ As will be explained more fully *infra,* the Court concludes that the only conduct pertaining to the crash that could potentially support an award of punitive damages was the flight crew's conduct in the last sixteen minutes of the flight, i.e., the decision to continue the approach into the Little Rock area at 2334 and thereafter. The Court notes that by 2334 Flight 1420 had reached Arkansas air space.

Factor (4) instructs the Court to consider the forum's interest in having its laws applied to the punitive damages issue. While a plain reading of factor (4) limits a court's consideration to only the forum's interest, courts have also considered a non-forum's interest where appropriate. *See, e.g., Simpson v. Liberty Mut. Ins. Co.,* 28 F.3d 763, 764 (8th Cir.1994).

Arkansas has numerous connections to the circumstances · of the crash and the punitive damages issue. The Defendant's employees' conduct that could potentially support a punitive damages award all occurred in Arkansas air space. As noted, the flight crew, while in Arkansas air space, received information from the air traffic controller at LIT that a thunderstorm had hit the airport. As in many aviation accidents, it was not fortuitous that the crash occurred where it did in Arkansas. Flight 1420's destination was Arkansas, and the crash occurred while attempting to land at LIT. All deaths and injuries occurred in Arkansas. Arkansas medical and emergency personnel responded to the crash. The vast majority of the passengers on Flight 1420 were Arkansas citizens.[25] The passengers enti-

---

**25.** The Court recognizes that the international passengers are not entitled to share in any punitive damages award under the terms of the Warsaw Convention, and that most of the domestic Plaintiffs have reached settlement agreements with the Defendant. However, punitive damages are not meant to compensate a plaintiff, but to punish and deter a defendant. Thus, the Court finds it relevant

tled to share in any punitive damages award are all Arkansas citizens. At the time of the crash the Defendant had several flights originating in and departing from Arkansas, and had a number of employees working there.

Perhaps most important, Arkansas's punitive damages policy as stated in its law reveals a strong interest in both punishing and deterring allegedly egregious conduct that occurs both within its borders and against its citizens, as well as its guests. The Defendant's activities in Arkansas that could potentially give rise to punitive damages were not by chance; the Defendant had operated flights into and out of Arkansas and had employees based there. As noted, the Texas legislature has placed caps on punitive damages awards. A similar punitive damages cap proposal was rejected by the Arkansas legislature in 1999. A jury's ability to both punish and deter the Defendant, from a financial standpoint, would be limited if Texas law is applied. Arguably, the Texas cap appears to unreasonably limit punitive damages in the context of the number of individuals killed and injured in this particular crash, the dollar amount of the various judgments and settlements on the compensatory damages claims, as well as the corporate size and resources of the Defendant. Under the Texas punitive damages cap, the potential to financially punish and otherwise deter an individual or a small business is much greater than the potential to punish and deter a large corporate entity such as the Defendant. If the Defendant's employees' conduct warrant punitive damages, Arkan-

sas clearly has an interest in seeing that the Defendant is effectively punished and deterred in accordance with its own laws. A capped jury award might not achieve this result.[26]

The Court recognizes that Texas, as a non-forum jurisdiction, also has a strong interest in the punitive damages issue. DFW is Defendant's primary hub and the flight originated there. The Defendant, in contending that both the cap and the vice principal rule should apply to this case, argues that Texas has a "superior interest in protecting its businesses and their employees from excessive financial liability for punitive damages, especially when the business' liability is based on respondeat superior."

On balance the Court concludes that Arkansas has a stronger interest in the circumstances of the crash and the punitive damages issue. Most important to the Court is the fact that the alleged egregious conduct as well as the injuries all occurred in Arkansas. The crash did not happen in Arkansas by chance; Little Rock was Flight 1420's destination and the Defendant had operated its business partly in Arkansas. Arkansas's interest in both punishing and deterring allegedly egregious conduct that occurs within its borders and which is harmful to its citizens is much stronger than Texas's interest in protecting its businesses' from liability for acts committed outside of Texas. The fact is that Texas has very little interest in punishing and deterring allegedly egregious conduct in Arkansas.

that most of the Flight 1420 passengers were from Arkansas.

**26.** Professor Howard Brill has noted about the Arkansas punitive damages law:

The jury fashions the award to appropriately punish the wrongdoer, regardless of his financial position or status. What would be sufficient punitive damages against one per-

son might be grossly excessive against another. The Supreme Court has reduced an award of punitive damages in light of the defendant's limited financial resources. But it has also referred to the net worth of the defendant corporation in affirming a high award.

Brill, *Arkansas Law of Damages* § 9–6 (footnotes omitted).

Factor (5) instructs the Court to consider the better rule of law. While the Court will not attempt to determine whether the Arkansas approach, without monetary caps, or the Texas approach, with monetary caps, is the better rule of law in a vacuum, the Court, as noted above, is of the opinion that the Arkansas law is the better rule of law based on the facts of the instant case. Furthermore, Arkansas's punitive damages *respondeat superior* rule, coupled with the requirement of proof of malice or of conduct from which malice can be inferred, provides sufficient protection to an employer.

Therefore, after considering factors (4) and (5), the Court concludes that Arkansas substantive punitive damages law will be applied.[27]

## VI. Discussion

Before analyzing Arkansas case law on the issue, the Court notes Professor Howard Brill's summary of Arkansas punitive damages law:

In contrast with compensatory damages, punitive damages are not intended to compensate an injured party for the wrongs suffered, but are instead a penalty inflicted by the law on a guilty party. The objective of punitive damages is to punish the wrongdoer and to serve as an example to other potential wrongdoers. The award of punitive damages to the plaintiff may well be a windfall to him personally, but still be appropriate within the dual purposes of punitive damages. As they are to serve also as an example to others, they are also described as exemplary damages. Because punitive damages are not a favorite of the law, significant limits are placed on their award. Punitive damages do not depend upon the underlying theory or cause of action, but instead

rest upon the defendant's conduct. First, punitive damages may be imposed when the defendant acted with malice. Malice is not personal hate, but is defined as an intent and disposition to do a wrongful act greatly injurious to another.... Second, punitive damages may be imposed if the defendant acted with such willfulness, wantonness, or conscious indifference to consequences that malice can be inferred....

Negligence alone, no matter how gross, is never enough to support punitive damages. Gross negligence, which may only indicate a careless disregard of the rights of others, cannot be equated with the requisite malice or intent. The added element of an intentional wrong or its equivalent in the form of conscious indifference or reckless disregard must be present. The motive of the defendant is material in determining whether he acted with mere negligence, indifference, or careless disregard of the rights of others, or whether his acts evinced an intent and disposition to do a wrongful act greatly injurious to another....

The standard of proof for exemplary damages is a preponderance of the evidence, but a concurring opinion of the Arkansas Supreme Court has suggested that the standard of proof should be clear and convincing evidence....

A corporation may be held liable for punitive damages because of the acts of its agents or servants, provided they have acted within the scope of their employment. The scope of employment depends upon whether the employee was carrying out the object and purpose of the enterprise or acting exclusively in his own interest.... A corporation may be held liable for punitive damages even though an employee in committing the

---

**27.** *See infra* note 31 for a discussion of the consequences had the Court determined that

Texas substantive punitive damages law should be applied.

wrongful act admittedly departed from his line of duty or responsibility. The mere blamelessness of the corporation itself is not sufficient to avoid .liability.

Brill, *Arkansas Law of Damages,* §§ 9–1, 9–2, 9–4 & 9–7 (footnotes omitted).

The Arkansas model jury instruction on punitive damages states in pertinent part:

Punitive damages may be imposed to punish a wrongdoer and to deter others from similar conduct. In order to recover punitive damages from [defendant], [plaintiff] has the burden of proving either:

(1) That [defendant] knew or ought to have known, in the light of the surrounding circumstances, that his conduct would naturally and probably result in injury and that he continued such conduct with malice or in reckless disregard of the consequences from which malice can be inferred; or

(2) That [defendant] intentionally pursued a course of conduct for the purpose of causing injury.

*Arkansas Model Jury Instructions—Civil* 2218 (4th ed.1999).

██ Turning to the case law, the Supreme Court of Arkansas has provided a particularly instructive discussion of Arkansas punitive damages law in *Alpha Zeta Chapter of Pi Kappa Alpha Fraternity v. Sullivan,* 293 Ark. 576, 740 S.W.2d 127, 132 (1987). The Eighth Circuit has noted that the *Sullivan* opinion provides the relevant punitive damages standard. *See Carpenter v. Automobile Club Interinsurance Exchange,* 58 F.3d 1296, 1304–05 (8th Cir.1995). The *Sullivan* court held:

Because the boundary between gross negligence and conduct that can be characterized as willful and wanton is indistinct, it is necessarily subjective in part. The two-fold intent behind punitive damages is to punish the wrongdoer and to exemplify such conduct for others to

note. Negligence alone, however gross, is not enough to sustain punitive damages.

There must be some element of wantonness or such a conscious indifference to the consequences that malice might be inferred. In other words, in order to warrant a submission of the question of punitive damages, there must be an element of willfulness or such reckless conduct on the part of the defendant as is equivalent thereto. *Hodges v. Smith,* 175 Ark. 101, 298 S.W. 1023 (1927); *Dalrymple v. Fields,* 276 Ark. 185, 633 S.W.2d 362 (1982).

In *Wallace v. Dustin,* 284 Ark. 318, 681 S.W.2d 375 (1984), we stated:

An award of punitive damages is justified only where the evidence indicates that the Defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice might be inferred. *Freeman v. Anderson,* 279 Ark. 282, 651 S.W.2d 450. 279 Ark. 282, 651 S.W.2d 450 (1983). "Before punitive damages may be allowed it must be shown that in the absence of proof of malice or willfulness there was a wanton and conscious disregard for the rights and safety of others on the part of the tortfeasor." *Dalrymple v. Fields,* 276 Ark. 185, 188, 633 S.W.2d 362, 363 (1982).

In *National By–Products, Inc. v. Searcy House Moving Company, Inc.,* 292 Ark. 491, 731 S.W.2d 194 (1987), this court vacated an award of punitive damages quoting from *Ellis v. Ferguson,* 238 Ark. 776, 385 S.W.2d 154 (1964):

Wantonness is essentially an attitude of mind and imparts to an act of misconduct a tortious character, such conduct as manifests a 'disposition of perversity.' Such a disposition or mental

state is shown by a person, when, notwithstanding his conscious and timely knowledge of an approach to an unusual danger and of common probability of injury to others, he proceeds into the presence of danger, with indifference to consequences and with absence of all care. It is not necessary to prove that the defendant deliberately intended to injure the plaintiff. It is enough if it is shown that, indifferent to consequences, the defendant intentionally acted in such a way that the natural and probable consequence of his act was injury to the plaintiff.

*Sullivan,* 740 S.W.2d at 132. To summarize, Arkansas punitive damages law requires either proof of actual malice or conduct from which malice can be inferred. Malice may be inferred where a defendant knows, or ought to know, that his conduct will naturally and probably result in injury, but is consciously indifferent or otherwise recklessly disregards the consequences. *See id.; see also Dalrymple v. Fields,* 276 Ark. 185, 633 S.W.2d 362 (1982); *Ellis v. Ferguson,* 238 Ark. 776, 385 S.W.2d 154 (1964); *Arkansas Model Jury Instructions—Civil* 2218.[28]

■ As noted *supra,* the Court concludes that the only conduct that is potentially relevant to the punitive damages issue in this case is Captain Buschmann and First Officer Origel's conduct during the last sixteen minutes of the flight. Though the flight crew was alerted to the potential for thunderstorms in the Little Rock vicinity for their expected time of arrival prior to their departure from DFW, it is evident that the flight crew had a reasonable basis for its "wait and see" attitude. At the time the flight departed DFW, less than one hour before the accident, the reported wind at LIT was less than ten knots and the reported visibility seven miles. Furthermore, Flight 1420 remained in favorable meteorological conditions, clear of all adverse weather while en route to LIT. As late as 2332, eighteen minutes before touchdown, the flight crew discussed flying "down the bowling alley" and that everything was "cool." It was not until 2334, sixteen minutes before touchdown, that the LIT Air Traffic Controller confirmed to the flight crew that a thunderstorm had hit the airport, with winds at 28 knots and gusts at 44 knots. It is at this point that the Defendant's Vice President of Flight testified that if he had been the pilot he would have discontinued the approach.[29]

Only the flight crew's decision to continue its approach into LIT starting at 2334 and its conduct thereafter should be considered in determining if the crew acted with the required recklessness or egregiousness sufficient to support the imposition of punitive damages under Arkansas law. Of course, as explained *supra,* the relevant Arkansas standard is malice or conduct from which malice can be inferred. Prior to 2334 the flight crew operated under a belief that the weather would not be a significant hindrance in their approach to LIT. But after 2334, with the flight crew becoming aware of the dangerous weather conditions, the situation changed and a jury could certainly find that the crew was, under the circumstances, negligent or even grossly negli-

---

**28.** As noted *supra,* the relevant standard of proof at trial must be taken into account at the summary judgment stage. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. While Professor Brill notes that the Arkansas standard of proof for punitive damages is a "preponderance of the evidence," some opinions suggest that the appropriate standard is "sub-stantial evidence." *See Stein v. Lukas,* 308 Ark. 74, 823 S.W.2d 832, 834 (1992). Even applying the more deferential standard to the Plaintiffs' punitive damages claims, a grant of partial summary judgment in favor of the Defendant is required.

**29.** *See infra* note 12.

gent in continuing its approach. But any decisions by the flight crew prior to 2334, any conduct by Mr. Trott, and any act or omission by the Defendant or its employees in permitting Flight 1420 to depart DFW on the night of the crash are too tenuous, speculative and remote, given the circumstances of the crash, to provide any support for a punitive damages award.

The Court also notes that the parties do not dispute that the flight crew was acting within its scope of employment on the night of the crash, as required by Arkansas law. *See Doss,* 899 S.W.2d at 464.

The Plaintiffs acknowledge that there is no evidence of actual malice on the part of the flight crew. Rather, they contend that malice can be inferred from the flight crew's conduct. The Plaintiffs argue:

> [The Defendant] and its Flight 1420 pilots, having full knowledge of the severity of the thunderstorms over and around [LIT] and that the existing conditions exceeded the maximum allowable limits for landing, recklessly disregarded both federal aviation rules and regulations and [Defendant]'s own operational polices, procedures and manuals, and, inexplicably, attempted to land in the middle of the raging storm. The pilots and [the Defendant] knew or should have known, that the pilots' conduct in the surrounding circumstances, would naturally or probably result in injury, but they continued such conduct in reckless disregard of the consequences. From the pilots' conduct and reckless disregard of the consequences, malice can and should be inferred.

In support of this argument, the Plaintiffs make the following contentions:

(1) The flight crew was reckless when it decided to land at LIT because the aircraft was operating in unsafe meteorological conditions and otherwise flew into an area of red precipitation on the aircraft's weather radar; and

(2) The flight crew violated numerous FAA regulations as well as the Defendant's own rules and regulations in that it flew in the presence of a thunderstorm, descended below a prescribed altitude without maintaining continuous visual contact with the runway, failed to deploy the spoilers, failed to conduct a stabilized approach, failed to properly configure the aircraft for landing, landed with knowledge of severe windshear alerts and an excessive crosswind component, landed in a crab position, landed with the runway visual range below the authorized limit and improperly used the reverse thrust upon landing.

Accepting both contentions as true and otherwise viewing the evidence in a light most favorable to the Plaintiffs, the Court nevertheless concludes that no reasonable jury could draw an inference of malice from the flight crew's decision to land Flight 1420 at LIT on the night in question. Simply put, it cannot be said that there is evidence from which a reasonable jury could find that the flight crew knew, or should have known, that its conduct would naturally and probably result in injury to others, and that the flight crew nevertheless continued such conduct in reckless disregard of the consequences, from which malice can be inferred. On the contrary, the uncontroverted evidence establishes that, until after the aircraft was on the runway, the pilots in good faith believed that the aircraft could be landed safely. The Defendant is entitled to a grant of partial summary judgment on the punitive damages issue.

During the last sixteen minutes of the flight the flight crew was not consciously indifferent to crashing or otherwise acting with a reckless disregard to such a consequence or to the general safety of the

passengers. Rather, the cockpit voice recorder reveals Captain Buschmann and First Officer Origel actively working to address the weather conditions in an effort to ensure a safe arrival. Negligent they were, but clearly they were not acting "with absence of all care." *See Sullivan*, 740 S.W.2d at 132. The flight crew took the initiative of changing runways and switching from a visual to an instrument approach. Their motive is especially apparent in the moments before touchdown when it became known that the aircraft had tracked right of the runway's centerline. Rather than ignore this situation, the flight crew quickly responded and saw to it that the aircraft landed only slightly right of the centerline. There is no evidence that the flight crew had any awareness that their conduct would probably result in injury and clearly the crew was not consciously indifferent to the risk of crashing the aircraft.

The same can be said of the flight crew's conduct post-touchdown. The flight crew diligently worked to regain directional control of the aircraft and to keep it on the runway. Not only was the safety of the passengers and the aircraft at stake, the flight crew was also acting to ensure its own personal safety. There is no evidence that Captain Buschmann or First Officer Origel had any motive or reason to disregard their own personal safety in landing the aircraft. *See Southeastern Aviation, Inc. v. Hurd*, 209 Tenn. 639, 355 S.W.2d 436 (1962) (noting in overturning a punitive damages award that the flight crew's own lives were at stake and they evidently expected to make a safe landing). Simply put, the flight crew had every reason to land the aircraft safely, and they obviously believed that they could do so.

The Court also notes that there is no evidence that Flight 1420 was operating at an excessive rate of speed in an effort to "beat the storm." In fact, the flight crew twice made decisions that would further delay the aircraft from landing. The flight crew decided it would be safer to land on Runway 4R instead of 22L, requiring the aircraft to again circle the airfield, adding approximately five minutes to the flight. The flight crew also decided to use an instrument rather than a visual approach, which also added time to the flight.

The Court's judgment that, as a matter of law, it could not be concluded by a reasonable jury that the flight crew knew or should have known that its conduct would naturally and probably result in a crash, or that the flight crew was consciously indifferent to, or otherwise recklessly disregarded, such a consequence, is bolstered by the uncontroverted evidence that Flight 1420 would have landed safely, the weather and runway conditions notwithstanding, had the inboard ground spoilers been activated. The Plaintiffs' argument that the "pilots knew or reasonably should have known that their objective to land under all the attendant circumstances could not be safely accomplished" is simply not supported by the evidence. The summary judgment record reveals that, despite the weather and runway conditions, the aircraft would have landed safely and the crash would not have occurred had the ground spoilers been activated.[30] Flight 1420, despite the weather, landed on Runway 4R in the touchdown zone, near the centerline and essentially on speed. The immediate cause of the crash was the flight crew's inability to stop the aircraft from overrunning the runway post-touchdown, a result of their failure to activate the ground spoilers. This fact establishes that the flight crew's belief that it could safely land the aircraft, weather conditions not-

---

**30.** There is no evidence, and the Plaintiffs do not argue, that the flight crew made a conscious decision to land the aircraft without activating the inboard spoilers.

withstanding, was not erroneous or baseless. The flight crew was certainly negligent in not activating the spoilers, but, as noted, mere negligence, or even gross negligence, cannot alone support an award of punitive damages under Arkansas law. There is no evidence that either pilot ever consciously contemplated even the possibility that they could not land the aircraft safely. And there is much evidence of their efforts to safely land the plane. Most certainly it cannot be said that the crew acted with "absence of all care." *See Sullivan,* 740 S.W.2d at 132.

As noted by Professor Brill in *Arkansas Law of Damages,* "punitive damages are not a favorite of the law." He further points out that, under Arkansas law, "punitive damages may be imposed if the defendant acted with such willfulness, wantonness, or conscious indifference to consequences that malice may be inferred" and that "[t]he motive of the defendant is material in determining whether ... his acts evinced an intent and disposition to do a wrongful act greatly injurious to another." Brill, *Arkansas Law of Damages,* §§ 9–1 & 9–2. Nothing in the summary judgment record would permit a reasonable jury to find that either of the pilots had a motive, intent or disposition to do anything injurious to the passengers or the other crew members of Flight 1420 or, indeed, to themselves.

In summary, the Court concludes that no reasonable jury could draw an inference of malice from the flight crew's conduct, and thus the imposition of punitive damages is not warranted under Arkansas law.[31] Partial summary judgment on the punitive damages issue must be granted in favor of the Defendant.

## VII. Conclusion

IT IS THEREFORE ORDERED that Defendant American Airlines, Inc.'s Motion for Partial Summary Judgment Dismissing Plaintiffs' Claims for Punitive Damages in all Domestic Actions[32] be, and it is hereby, GRANTED.

IT IS FURTHER ORDERED that the Defendant's Motion to Exclude Expert Testimony Based on Computer Simulations or, in the Alternative, to Compel Production of Computer Software[33] be, and it is hereby, DENIED as moot.

IT IS FURTHER ORDERED that the Defendant's Supplemental Motion to Exclude Expert Testimony Based on Computer Simulations or, in the Alternative, to Compel Production of Computer Software[34] be, and it is hereby, DENIED as moot.

31. The Court notes that the parties have failed to locate any reported case in which punitive damages were recovered from a commercial airline as a result of an aviation accident based upon the conduct of the flight crew. The Court also notes in the alternative that even if it had chosen to apply Texas substantive punitive damages law, summary judgment in favor of the Defendant would have been warranted. Texas provides that punitive damages may be awarded against a corporation for the acts of its employees only if a "vice principal" authorizes, approves or ratifies the act. *See Hammerly Oaks,* 958 S.W.2d at 387. Captain Buschmann was not operating Flight 1420 as such a "vice principal," and there is no evidence that a "vice principal" so approved or ratified the flight crew's conduct. Furthermore, even absent the "vice principal" requirement, Texas requires that punitive damages may only be awarded where a plaintiff proves by clear and convincing evidence that the harm resulted from malice or a willful act or omission. *See* Tex. Civ Prac. & Rem.Code Ann. § 41.003(a). The Court is satisfied that no reasonable jury could find such malice or a willful act or omission under the Texas standard.

32. Doc. No. 117.

33. Doc. No. 134–1 & 134–2.

34. Doc. No. 136–1 & 136–2.

IT IS FURTHER ORDERED that the Intervenor WeatherData, Inc.'s Motion for Protective Order Against Unauthorized Use or Disclosure of Confidential Information[35] be, and it is hereby, DENIED as moot.